May it please the court, Revit Singla for Abbott Laboratories, plaintiff appellate. I'd like to start, your honors, with the issue of written description, very briefly, and then move on to the issues of anticipation and obviousness, the jury's general verdict on that issue. Unless the court has questions, I was not going to address the issue of the doctrine of equivalence, the infringement issue. Well, let me suggest that, let me suggest that you focus your attention on the obviousness question. Yes, sir. So, as the court knows, there was a general verdict of anticipation or obviousness, and there is no dispute between the parties that if there was error in any of the underlying three theories on which the, which were argued to the jury on anticipation and obviousness, that this court must reverse the verdict. You have a question, your honor. Yes, your honor. Is that a general verdict or a specific, a special verdict? That's a general verdict on that question, your honor. As to that question, it's a general verdict. There's multiple theories underlying that. Does it, does it, how would we know which of the two legal theories the jury concluded there was infringement? Well, that's the reason, I agree, your honor, that's the reason it is a general verdict, and that's the reason the Supreme Court precedent denied it. It might have relied on both, both those considerations, might it not? Correct, your honor, but if there is legal error as to any of the underlying theories, or the jury instructions on any of the underlying theories, then... It doesn't say anticipation, it's an anticipation or obviousness, and all that it establishes is the jury accepted at least one of those and maybe both. That's correct, your honor, and the Supreme Court, Sunkist-Grower's case, and there's, again, there's no dispute, they don't dispute this in their papers. If there is error on any of the underlying theories, this court must reverse that general verdict. Well, with respect to obviousness, obviousness is ultimately a question of law, so does it, does it really matter if we can determine that issue as a matter of law? Does it, does it matter whether there is uncertainty as to what the verdict was, on what ground the verdict was based? That, that is a fair point, your honor. I do take your court's point. If the court concludes as a matter of law that there is obviousness, then perhaps there would not have to reverse. So let me address obviousness there. And in particular, as to the Nankai reference... Yes, your honor. What, what is the fact issue with respect to that? Isn't it really purely a legal question? Let me address that, your honor. On the Nankai patent, in terms of obviousness, now this court's precedent after KSR, and the KSR decision itself, holds very clearly that obviousness still requires some reason or motivation to combine to produce the invention. You can't just say the elements are in a piece of prior art. The court, the KSR court said that you still need to determine whether there was an apparent reason to combine the known elements in the fashion claim. This court, in the InnoGenetics, Ortho, McNeil, Takeda cases, repeatedly has said you still have to show and prove some kind of motivation must be shown from some source so the jury can understand why a person of ordinary skill would have thought of modifying a reference to achieve the patented method. Okay, accepting that. But the motivation doesn't have to be disclosed in the prior art, does it? Correct, your honor. I would agree with that. Now, in this case... But what I was going to ask you about is that you concede in your yellow brief, as I understand it, that having the aperture in the cover was obvious. Yes, your honor. Cease to argue about that. We've never disputed that, your honor. Okay, well, maybe you did, maybe you didn't. Okay. So what's missing? In Nankai, once you admit that it could be modified to have the aperture on the cover. What's missing, your honor, is the core of the invention, which is a downstream counter-electrode with directional flow of the blood. There is no disclosure in Nankai, and there's really not a dispute about this, of anything that has a downstream counter-electrode with directional flow of the blood. Isn't that disclosed in Figure 3, albeit three times? Figure 12. I'm sorry, Figure 12. Figure 12. No, your honor, it is not disclosed in Figure 12. In Figure 12... Well, you have the working electrode 43, for example, and the counter-electrode 5, with the path of the flow of blood being from the working electrode toward the counter-electrode, correct? Yes, your honor. It is not disclosed in Figure 12, and let me address that issue. First of all, their expert, Dr. Turner, never testified that Figure 12, as the court sees it here, discloses directional flow of the blood. There is no dispute below that this figure, as it is, does not show, and there's no dispute among the witnesses, directional flow, because the blood, as it comes in, could take any of the three paths, and you don't know which of the working electrodes it will touch first. But your assumption is that the claim requires that you know which of the three paths it will do, it will take. You know, I mean, there is some thing apparent from the face of Figure 12 that indicates where the blood will start flowing and the areas where it could flow. So why isn't that directional flow within the meaning of the path? So this was decided by the district court as a matter of part of its claim construction, continuing claim construction, at summary judgment. At summary judgment, and we have the summary judgment documents in the record, the defendants argued that this shows directional flow, because the blood, as Judge Dyke said, will hit one of these working electrodes first. And the district court said no. It said that the idea that, let me get the exact language here, this is from Joint Appendix 4450, that the district court held that B.D. Nova's argument, quote, B.D. Nova's argument that the particular direction that the sample will be guided does not need to be predetermined, that it's known before the sample is introduced, these are all, these are my quotations, strains predulity, and they rejected this argument. And on appeal, we can reach a different conclusion, can't we? On appeal, they have not challenged the district court's construction of the term directional flow. That is not an argument they have raised anywhere in their briefs to question or challenge the district court's construction of the term directional flow. And let me explain why the district court's construction of directional flow makes sense. What exactly did the district court say directional flow meant? The district court said directional flow means orientation and guidance in a particular direction, and then interpreted the broader phrase defining a sample transfer path for directional flow to mean, quote, providing a channel for the sample to move in a particular direction from the application point to and including the electrodes. Well, I don't see that the theory that I just asked you about is inconsistent with that claim construction. It is, Your Honor, and this is the reason why. The entire point of the patent is that the working electrode be covered in blood before the reaction began. You didn't put that in as a claim limitation. That's true, Your Honor, but it did influence the court's construction of these terms. And the reason the court, the district court, construed the terms as it did is because it understood the point of the patent, the specifications of the form of construction. Yeah, but the claim construction that the court gave doesn't include the requirement that the short-fill problem be solved either, does it? No, no, it does not. But what the district court's claim construction does require is that it be known in advance how the blood flows. And we submit, once you have that proper claim construction, figure 12 doesn't meet that. There's not really a dispute about it. I would point out that Dr. Turner, their own expert, did not get up and testify at trial that this figure, as it is, shows directional flow. I don't see how you can avoid the conclusion that there was a directional flow, simply by virtue of the fact that the patent talks about the introducing port 10, and it talks, for example, about the discharge ports 11, 12, and 13. Well, if a liquid comes in in an introducing port and leaves at a discharge port, there has to be flow there between. Correct. But then the terms directional flow have been given no meaning. The court then would have read, this court would have read that term out of the claims, because every device like this has some kind of flow from start to end. So the phrase directional flow would then mean nothing. It would simply be redundant. It would simply mean directional flow. There's nothing wrong with that. But the phrase directional flow was construed by the court, and I want to emphasize this was not challenged on appeal, to specifically not include this idea that it could just mean coming in from one side and moving generally towards the ports, that the district court rejected the idea that you don't have to predetermine the flow. And there's a reason for that. There's a good reason for that. Otherwise, doesn't it have to flow in one direction from one place to another? Yes, Your Honor. And in this one, it does not. I agree. It does not flow in one direction from one place to another. It comes in, and their expert admitted, this was not disputed below, that you have no idea whether it's going to go this way or down the second one or all three of them at the same time. You just have no idea what is going to happen. You may not know beforehand which one it's going into, but once it selects the flow, it flows in that direction to get out, doesn't it? It does once it selects that, but the point is exactly, the point I'm making, Your Honor, is that the district court held... Is your position that whether there's directional flow requires that at the outset of the flow, you have to know exactly what path it's going to follow? Yes, Your Honor. That is our position, that you have to know in advance. The point of directional flow is to know how the blood is going to flow and to know that the working electrodes will be covered. Why doesn't it mean, when it says that it's flowing in a particular direction, as it seems from something that might go around in a circle or some other way and come right back to where it started? Because the construction of the term, in light of the specification, the specification explains that the idea is to make sure to set this up so that the working electrode is covered with blood before the counter-electrode. Where does the specification tie the notion of directional flow to the short coverage problem? You know, I don't have a reference handy. I'll find something before my rebuttal period. But I'm confident that the District Court's basis for its construction was its understanding from the specification. Let me put a hypothetical to you. I think I know how you're going to answer this. Suppose you have a tube, a foot long, and the top is open, and the bottom has five holes in it. And you pour water into the top, and what you know is it's going to flow to the bottom of the tube and then exit through one of those five holes. You don't know at the beginning which hole a particular drop of water is going through. And I take it, under your theory, that's not directional flow because you cannot say at the outset which hole it's going through. Is that correct? Would that be your position? Yes, Your Honor, because in this application, it matters which hole. If it didn't matter which hole it went through at the bottom, if it was a sieve or something, then perhaps the term in that context wouldn't matter. But in this context, it does matter exactly how it flows. It does matter that the working electrode is covered before the counter-electrode. That's the whole point of the invention. Well, that's why it's so critical for you to show us some linkage between the two in the specification. Yes, Your Honor. All right. We'll allow you to do that on rebuttal. Let's save your time and let's proceed. Bradford Battey, again, for Beckman, Dickinson, and Melvin. Before you begin, Mr. Battey, you had filed a cross-appeal in this case, and then you filed a motion to treat that as an affirmative defense. Correct. But, of course, there was no offer to substitute a corrected brief with the corrected word limit, and as a result of the filing of that cross-appeal, it burdened the court with extra pages to read, resulted in a reply brief from the other side that was more than they might have otherwise been entitled to. So the cross-appeal clearly was improper, and the court is going to dismiss the cross-appeal. Your motion to treat that cross-appeal as an affirmative defense is also denied, and your argument should be limited to the question of validity. Okay. Yes, Your Honor, and I apologize for the extra burden on the court. There were two district court judges. One was Judge Jenkins. He retired from the bench after a summary judgment, and then we had Judge Alsop. Judge Alsop, at trial, addressed the specific question of sample transfer path for directional flow specifically, and that's on page 5909. And what he said is that what that means is providing a channel for the sample to move in a particular direction from the application point to and including the electrodes. And he said a channel could have a right-angle turn or curved turn, and it's still directional flow. So this issue of directional flow is exactly, I think, what the panel was suggesting. There's an application point, and there's electrodes. The flow is from the application point to the electrodes. You can make turns, and you can have three different channels. It's all going to the same place to the electrodes. Now, in terms of the question regarding whether there was some linkage in the patent between directional flow and this short-fill problem, no, there is no linkage in the patent. The directional flow was admitted by all of the experts as being something that was old, and, in fact, every figure of NANCHI had the directional flow. Their expert, Dr. Heinemann, said figure 8 had directional flow. What they linked to the short-fill problem was the downstream counter-electrode. And the downstream counter-electrode is clearly shown in figure 12. It's in all three channels. Both experts actually testified that you could look at the NANCHI reference and know you could construct it with one channel. But they're right about one thing, aren't they, that if the directional flow limitation is directed or linked to the short-fill problem, that in the NANCHI reference, if you had the blood flowing into a single finger, you could have a reading taken. Even though the first electrode would be completely covered, the other two electrodes might only be partially covered so that you would get an inaccurate reading. That is possible under the NANCHI reference, correct? Yes, that's certainly possible, but I think if they had wanted to tie the downstream electrode to the short-fill, they could have included that as a claim element, and they didn't do that. But, I mean, another point on that is both experts, including Dr. Heinemann, their expert, said that one reading, the NANCHI patent would know, that you could build it with one channel, in which case the multiple channels wouldn't be a problem. Yeah, I'm skeptical about that. But I suppose any time liquid flows, it has to flow in some direction. If it's not flowing in any direction, it's not flowing. That's right. I don't quite understand why this adjective is in there, but it's there. Yes. Well, in terms of this modified figure, we call it modified figure 12 with one channel, I can read what their expert actually said. Yeah, I've read it. I don't find it very convincing. Okay. So, if you treat it as a three-finger embodiment, there is a risk that the short-fill problem won't be solved. But, of course, the short-fill thing is not a claim limitation. Right. The question is, was there some linkage between the directional flow limitation in the specification and the short-fill problem? Not that I'm aware of, Your Honor. I mean, there was a direct linkage between the short-fill and the downstream. That's where the linkage was. The directional flow was something that was well-known in the prior art. All it is is just going from the application point to the electrodes. That's the only point of the directional flow, based on my understanding of the patent. In terms of the other disclosures of the patent, and certainly if you want to look at the case in terms of obviousness, going from the three to one would have been obvious. That would have been an obvious modification from that because the patent actually discloses that you can have multiple channels and each one had to be accurate and so forth. I suppose you could have more than three. I don't think it discloses you could have less than three. Well, it says the number can vary. Certainly, each channel was intended to be accurate. If you wanted to simplify it, as their expert said, you would go to one. If you wanted to simplify it, he said that was a relatively simple construction. That was just well-known back then. In terms of what a competitor would do, it's probably much simpler to go with one channel than with three channels. Obviously, you want each one to be accurate. There is a statement in the reference early on that characterizes this as having, let me just find it, column three, lines six and seven. It talks about an electrode system comprised of at least an electrode for measurement and a counter electrode. Yes, that's right. One could argue, I suppose, that that suggests that you only need one set of electrodes. That's just a broad statement up front that applies to all of the embodiments and not necessarily figure 12. I don't know that that's really persuasive about just having one of the three fingers in figure 12. There also was evidence. There was plenty of evidence from both experts that figure 8 included all of the elements except for the downstream. Our expert, Professor Turner, said that you would know, based on reading this patent, that you could put any electrode configuration in figure 8. No matter how you looked at it, whether it was figure 12 as is, figure 12 as modified with one or a combination. Well, the trouble is if you're trying to combine it with figure 8, then maybe you've got a fact question as opposed to a legal question. Well, I don't think you need to go there. In my view and in our view, as we presented to the jury, everything is in figure 12, that all of the elements are satisfied. Except the aperture on the cover. Right, and your expert said that NANCI actually teaches the interchangeability of the end fill versus the top fill, that NANCI is within four corners. They don't need to go there. They've conceded the point. Yes, yes. So everything is in figure 12 as a matter of law. Going beyond that, everything is within four corners of the reference. Depending on how you come out on the directional flow issue. I know how we come out on it. The panel, of course, can come out differently. They had also, there was this question of stipulations. They had stipulated during the trial that the downstream counter electrode was contained in figure 12. And this was evident in all of the testimony. What's the point? There's no issue about that. Correct. No, that's right. They're not arguing. That's right. So I guess the only issue that they're arguing is whether there's directional flow in figure 12. I would think that would be the case. I think that's what it comes down to. And I think that as the district court defined it, there is. Now, Mr. Singler was talking about a statement that Judge Jenkins made in response to a summary judgment motion where he said the flow needs to be predetermined. That was not part of his formal claim construction. It was stated in response to a summary judgment motion. But I think it was then clarified by Judge Alsup during the trial when he came out with the construction or clarification during the trial, which I read when I started out. So I don't think there's any question about that. The predetermined nature of it, I don't think, is something that the patent discloses or requires. There was another basis for obviousness, which was based on Aikido, the Aikido reference. The jury properly found, or it was one basis for the obviousness, the jury properly found that there had not been a reduction in practice because of the directional flow was not shown to be in that product due to the electric support. So unless there's any questions from the panel, I won't belabor. I just don't want to get up here and— We always appreciate returning time, so thank you very much. If I could make an effort now to address the question that the court asked on directional flow. If the court looks at the 890 patent, the 890 patent has a number of drawings. These are figures two, A through E, in which it shows various arrangements of the electrodes to solve the short-fill issue. And then in column two of the specification, it talks specifically about how the invention is intended in part to address inadequate sample volume. We're in column two? Column two, line 50, Your Honor. I apologize. And it explains that part of the invention is to address inadequate sample volumes and that the way it does that, this is at line 55, is to make sure that the reference electrode is downstream from the working electrode such that a circuit is not established until the working electrode has been completely covered by sample and the sample has reached the reference electrode. Thus that the idea being disclosed here is that you put the working electrode, counter electrode, downstream of the working electrode to make sure it's covered with blood. And then on the next page in column four, starting at line 34, it talks again about positioning the reference electrode downstream and how that has the benefit of making sure the working electrode is completely covered by sample. Then if we go further down, starting about line 50, again it calls out the figures 2A through E and it talks about how the working and dummy electrodes are spaced in the direction of the sample flow. It's talking about how figures 2 show how you set up the working and counter electrodes in the direction of the sample flow, again, following up on the previous paragraph, to ensure this solution to short fill. And that is the direction of sample flow is the source of the directional flow requirement. The directional flow requirement, as I think Judge Friedman suggested to some degree, would be somewhat meaningless otherwise because every liquid going through the channel has flow. So for this term, this limitation to have meaning, it has to have something more than simply flowing through the channel. It has to be the word directional that has import and it has to have import more than simply from the aperture to the port because again, every one of these devices is going to have flow from where you put the blood in to where the blood comes out. I suppose directional flow can note that it's going from left to right, from right to left, up and down. It's going in a particular direction. It's going in a particular direction and the point is that the patent discloses that particular direction. The point of it is to make sure there's a particular direction and there's an arrangement of electrodes in that sample flow where the working electrode is covered before the counter. I think you have a fair point that the directional flow has to be a flow in the direction first of the working electrodes and then to the counter electrodes rather than the opposite. That's correct. But it seems to me perhaps a stretch to suggest that it has to solve the short fill problem. We're not saying it has to solve the short fill problem. The directional flow. We're not saying that. I agree, Your Honor. That's not a claim limitation. I don't dispute that. But the interpretation of directional flow is made, construction, in the context of the specification. And for the specification to work, for it to make sense, this directional flow has to be, you have to know in advance that it's going to work that way, that the working electrode will be covered first. You're saying, as I understand you, that for it to be directional flow, it not only has to go in a particular direction but also has to be going to a particular pre-designated point. Yes, Your Honor. That seems to me what you're arguing. But I think based on two claim limitations. The first has to be directional flow, predetermined flow of the blood in a certain path, more than just from opening to exit, a predetermined path. And there are more limitations which require that in that path, in that sample path, that the working electrode come upstream of the counter electrode. And all those terms have no meaning if you don't know how the blood is going to flow. How do you know the working electrode is actually upstream of the counter electrode if you don't know where the blood is going to flow? Again, going back to Figure 12 with the three fingers, you don't know in that case that any of those working electrodes are actually upstream of the counter electrode. I don't understand what you're saying. But it seems to me in Figure 12 that the flow starts in the direction of hitting the working electrode before hitting the counter electrode. The problem is that because you have three fingers here, only one of the working electrodes might be covered. The others might be partially covered or not covered at all. Or not covered at all. Correct, Your Honor. So you don't know that either of any of these are actually upstream of the counter electrode. You can't say that 42 is upstream of the counter electrode. It doesn't meet the claim limitation that the working electrode, that you know that the working electrode is going to be upstream of the counter electrode. You simply don't know that. All right. I think we have your argument. Thank you, Your Honor. That counts for both sides of the case as submitted.